**Felix J. MURPHY, Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY, Defendant.**

**No. 00–CV–269 (DRH).**

United States District Court, N.D. New York.

Jan. 16, 2003.

Harder, Silber & Bergan, Albany, NY (George W. Harder, of counsel) for Plaintiff.

Nixon Peabody LLP, Albany, NY (John E. Higgins, of Counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

HOMER, United States Magistrate Judge.

Plaintiff Felix J. Murphy ("Murphy") brought this action under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621; the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.;* and New York state law alleging in three causes of action that he was transferred and then terminated from his employment with defendant General Electric Company ("GE") because of his age. Am. Compl. (Docket No. 14) at ¶¶ 21, 24–26, 29–30. Murphy seeks declaratory and injunctive relief as well as compensatory and punitive damages. *Id.* at pp. 10–11. Presently pending are GE's motions (1) to preclude the testimony of Murphy's expert witness (Docket No. 33), and (2) for summary judgment pursuant to Fed.R.Civ.P. 56(b) (Docket No. 41). For the reasons which follow, both motions are granted in part and denied in part.[1]

### I. Background [2]

The facts are set forth herein in the light most favorable to Murphy as the non-movant. *See* Section III(A) *infra.*

1. At oral argument held on November 15, 2002, Murphy abandoned his constitutional, Title VII and ERISA claims.

2. Murphy failed to file a statement of material facts in opposition to GE's statement of material facts. *See* Docket No. 47. Under N.D.N.Y. L.R. 7.1(a)(3), an opposing party is required to file a response to the statement of material facts which "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Otherwise, "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *Id.* (emphasis omitted). "The courts of the Northern District have adhered to a strict application of Local Rule

Murphy was born on August 24, 1937. On April 27, 1981, Murphy commenced work for GE. Murphy Aff. II (Docket No. 50) at ¶ 1. One year later, then age forty-four, Murphy's employment was terminated. Murphy Dep. I (Docket No. 55, Ex. 18) at 124–25. Murphy filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that he was terminated because of his age. Murphy Dep. I at 125. In 1983, at age forty-five, GE rehired Murphy after settling his EEOC complaint and transferred Murphy to Schenectady to work in Power Systems. Murphy Dep. I at 125. Thereafter, Murphy received raises, promotions and favorable evaluations and became an executive-level employee. Murphy Aff. I (Docket No. 55, Ex. 6) at ¶¶ 3, 6; Pl. Exs. P–T; Def. Ex. 10 (Docket No. 55); Jenis Aff. (Docket No. 42) at ¶ 11. At age fifty-two, Murphy was promoted to manager of the Parts Center under the supervision of Donald Jenis. Jenis Aff. at ¶ 14; Def. Ex. 10. In November 1992, Jenis became the manager of the Generator Manufacturing Department and Ellen Smith became Murphy's new manager. Jenis Aff. at ¶ 12.

In March 1994, the Outsourcing Initiative was created with Jenis as its manager. Jenis Aff. at ¶ 17; Dell Orfano Aff. at ¶ 6. This project sought to reduce costs by obtaining components for Power Systems products from manufacturers outside GE rather than manufacturing those components within GE. Jenis Aff. at ¶ 17. The project was expected to take twelve to eighteen months. Id. Smith suggested that Jenis recruit Murphy for Outsourcing. Id. at ¶ 30. Smith told Murphy that he could transfer to Outsourcing or be terminated. Murphy Aff. I at ¶ 8. Murphy complained to Richard Baker, Human Resources Manager, that he was being transferred because of his age. Murphy Aff. I at ¶ 10. Baker told Murphy to take the position and not to worry because it was for five years and Murphy could then retire at age sixty-two. Murphy Aff. I at ¶ 10. Baker also told Murphy that Murphy had no choice but to move to Outsourcing. Id. On June 7, 1994, Jenis hired Murphy, then age fifty-six, to work in Outsourcing. Jenis Aff. at ¶ 30; Murphy Aff. I at ¶ 11, Ex. D.

Employees at GE received rankings for "promotability" on a scale of 1–5 with 1 being the highest ranking. Murphy Aff. II at ¶ 6. Employees were also ranked for "performance" on a scale of A–C with A being the highest ranking. Id. A code of 3–B or lower meant that an employee was not promotable. Id. at ¶¶ 6, 31; Smith Dep. at 50. Prior to August 1994, Murphy had a promotability code of 2. Murphy Aff. II at ¶ 6; Pl.Ex. B. Murphy always received satisfactory or excellent performance reviews. Murphy Aff. II at ¶ 6; Pl. Exs. P–T. On or about August 2, 1994, Murphy learned that he had received a performance/promotability code of 3–B. Murphy Aff. II at ¶ 6, Ex. C. Of the twelve employees in Outsourcing, eleven were age forty or older ("older employees") and eight were given a performance/promotability code of 3–B., Pl.Ex. G–1.

On March 10, 1995, GE announced a restructuring plan which would cause a reduction in workforce (RIF). Def. Ex. 23. On March 20, 1995, Jenis verbally advised Murphy that Murphy had been

7.1(a)(3)'s requirement on summary judgment motions." *Giguere v. Raciot,* No. 00–CV–1178, 2002 WL 368534, at *2 (N.D.N.Y. Mar.1, 2002) (McAvoy, J.). Accordingly, this Court will accept GE's statement of material facts as true for purposes of this motion unless contradicted by other matters of record. However, clearly conclusory, nonfactual assertions contained in GE's statement exceed the scope of a permissible statement and will not be considered.

selected for termination in the RIF effective April 28, 1995. Murphy Dep. II at 126; Def. Ex. 25 at 1. Jenis told Murphy that Murphy could not be promoted and had to be moved to make room for a younger person. Murphy Aff. I at ¶ 21. Murphy requested that GE find another position until he turned sixty so that he could retire with his full pension and medical benefits. Jenis Aff. at ¶ 39. GE extended Murphy's termination date to May 1995. Jenis Aff. at ¶ 40. On April 13, 1995, Jenis told Murphy that his new termination date had been further extended to June 30, 1995. Def. Ex. 25 at 1; Jenis Aff. at ¶ 40.

On June 30, 1995, Robert Dell Orfano formally notified Murphy in writing that Murphy's employment was being terminated as part of the RIF. Def. Ex. 10. On the same day, Murphy's termination date was further extended to August 31, 1995. Murphy Aff. I at ¶ 2. On August 18, 1995, Murphy's termination was suspended until May 3, 1996. Murphy Aff. I at ¶ 2; Bassett Aff. at ¶ 37. Murphy's employment was finally terminated effective November 8, 1996. Murphy Dep. I at 172–73. Murphy received one year of "protected service" and was finally terminated effective November 7, 1997 at age sixty. Murphy Dep. I at 173.

After Murphy received the initial notice from Jenis of his termination, Murphy applied for fifty-seven jobs with GE. Pl. Exs. I, J, K; Def. Exs. 29, 32–33.[3] Of the fifty-seven jobs, four were canceled, one was filled by a younger person before Murphy sent his application, nine were filled by younger employees, four were filled by persons of an unknown age and eight were filled by persons of unknown identities and ages. Def. Exs. 29–30, 33. There was no information provided regarding the other

thirty-two applications. Murphy complained to GE that he was being discriminated against because of his age. Murphy Aff. I at ¶ 15. Murphy was told that once an employee reached age fifty-five at GE, there were no longer any jobs available. Murphy Aff. I at ¶ 15. On May 6, 1996, Murphy commenced employment at another company where he remained until July 13, 1999. Murphy Dep. II at 374, Def. Ex. 28. Murphy also filed a complaint alleging age discrimination with the EEOC, which found that reasonable cause existed to support Murphy's complaint. Pl.Ex. C. This action followed.

## II. GE Motions to Preclude

### A. Murphy's Expert Report

■ GE moves to preclude the reports and testimony of Murphy's expert witness, Dr. Harriet Zellner, concerning statistical analyses on the ground that the reports do not satisfy the requirements for relevance or reliability established by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. Docket No. 36. GE contends that Dr. Zellner's reports used inappropriate methodology, did not indicate if the results were for a disparate treatment or disparate impact claim, and failed to account for non-discriminatory reasons for any variances.

■ Under Fed.R.Evid. 702, an expert witness' testimony is admissible "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." A district court is charged with the "task of ensuring that an expert's testimony both rests on a reliable foundation and is

---

**3.** Murphy alleges that he applied for eighty-four jobs. Murphy Aff. I at ¶ 30. However, the evidence provided showed only fifty-seven applications.

relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Dr. Zellner first performed a statistical analysis for the 1995 terminations at Power Systems. Zellner Report I (Docket No. 35, Ex. B). The analysis compared the 2,813 active exempt employees with the 259 employees selected for termination. *Id.* at 1–2, Table 2. Dr. Zellner concluded that 59.2% of the workforce were older but that older employees accounted for 70.3% of those terminated in the RIF. *Id.* at 4, Table 1. This 11.1% disparity is likely to occur by chance once in 1,000 times. *Id.* at 4–5. Dr. Zellner concluded that there is less than a 5% probability that age was related to termination by chance. *Id.* at 5. Dr. Zellner then analyzed the terminations by division within Power Systems. Zellner Report I at 5, Table 2. Dr. Zellner concluded that age was a statistically significant factor in termination decisions when controlling for division. *Id.* at Table 2. Finally, Dr. Zellner analyzed the terminations by education level in addition to division and concluded that age was a statistically significant factor. *Id.* at 7, Table 3. This sufficed to satisfy the minimum requirements for relevance and reliability. GE's motion to preclude on this ground is denied.[4]

■ Dr. Zellner also performed a statistical analysis of the 1996 terminations at Power Systems. Zellner Report II (Docket No. 35, Ex. C). Dr. Zellner analyzed the 2,660 active exempt and non-exempt employees. *Id.* at 1. Dr. Zellner also included the list of ninety-three exempt employees who received a termination notice in 1996. *Id.* at 1. Dr. Zellner admitted that there were inadequacies in the population used and that the results would have been different had she been able to identify and exclude non-exempt employees from her analysis. *Id.* at 2. Dr. Zellner also could not analyze by division and education in connection with the 1996 terminations. Furthermore, Dr. Zellner found that 62.8% of the employees were older but that such older employees represented 69.8% of the terminated employees. *Id.* at 5, Table 1. This was not statistically significant. *Id.* at 6, Table 1. Dr. Zellner did not analyze any other variables in this analysis. *Id.* Thus, this report was based on insufficient data or facts and fails to meet the requirements of Fed.R.Evid. 702. GE's motion to strike as to those opinions is granted.

## B. EEOC Determination

GE contends that the EEOC determination is inadmissible. GE contends that the probative value is outweighed by the danger of unfair prejudice because the EEOC findings are undercut by the evidence of record. GE Reply (Docket No. 53) at 7–8. Murphy contends that the EEOC report is highly probative of the ultimate issue and should be considered. Pl. Mem. of Law at 7–14. It is within the discretion of the district court whether to admit employment agency findings. *Paolitto v. John Brown E & C. Inc.,* 151 F.3d 60, 64 (2d Cir.1998). The finding of the EEOC will be considered on this motion.

## C. Murphy's Affidavit

GE contends that paragraphs 4–6, 11, 13–17, 19–22, 25–27, 29 and 41–42 of Murphy's affidavit (Murphy Aff. II, Docket No.

---

**4.** GE advances other arguments in support of its motion to preclude, including Dr. Zellner's failure to perform a multiple regression analysis. However, at least as to Murphy's disparate treatment claim, these arguments go to the weight of the expert report and not its admissibility.

50) should be precluded because the allegations are not based on Murphy's personal knowledge. GE Reply at 8–9. GE further contends that paragraphs 3, 24, 28, 30–33 and 35–40 should also be stricken because they are conclusory allegations based on conjecture and speculation. *Id.* Paragraphs 3–6, 11, 13–17, 19–22, 24–27, 30–33 and 35–42 are based on Murphy's personal knowledge and will be considered. GE's challenge to these paragraphs goes to the weight of the testimony and not their admissibility. Paragraphs 27–29 are based on Murphy's own review and simple mathematical calculations. Such evidence will also be considered. *See Stratton v. Dep't for the Aging, for the City of New York,* 132 F.3d 869, 877 (2d Cir.1997). GE's motion to preclude those portions of Murphy's affidavit is denied.

### D. Hearsay

■■■ Finally, GE contends that Murphy may not rely on inadmissible hearsay to support his opposition to GE's motion for summary judgment. GE Reply at 6–7. Specifically, GE contends that any statements by GE's Chief Executive Officer, Jack Welch, and statements by Ellen Smith, Murphy's manager, to Walter Foster and Gary Hankin are inadmissable. A party may rely on inadmissible hearsay to oppose a motion for summary judgment upon a showing that the evidence will be available at trial. *Burlington Coat Factory v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985).

■■ Welch's statements were videotaped. Harder Aff. (Docket No. 49) at ¶ 2. Such statements are admissions and are not hearsay. *See* Fed.R.Evid. 801(d)(2). Foster made a statement to the EEOC that Smith told him that she must terminate older employees. Pl.Ex. E (Docket No. 52); Murphy Aff. II at ¶ 9(a). This statement is an admission and not hearsay if offered through Foster. Hankin's statement to Murphy that Smith told him that she intended to replace Murphy with a younger person because Murphy was too old is likewise admissible as an admission through Hankin. Murphy Aff. II at ¶ 9(b), Murphy Dep. II (Docket No. 55, Ex. 19) at 204. Both Foster and Harkin are subject to subpoena and are, therefore, presumptively available to testify at trial.

GE's motion to preclude evidence of these statements is denied.

### III. GE's Motion for Summary Judgment

The first cause of action alleges that Murphy was terminated from his position with GE in violation of the ADEA. Am. Compl. at ¶ 21. The second cause of action alleges that GE's actions violated ERISA and the ADEA by depriving Murphy of pension rights. *Id.* at ¶ 26.[5] The third cause of action alleges that GE violated Murphy's rights under N.Y. Exec. Law § 290 *et. seq. Id.* at ¶ 30. GE seeks summary judgment on all three causes of action.

#### A. Standard

Under Fed.R.Civ.P. 56(c), if "there is no genuine issue as to any material fact[,] . . . the moving party is entitled to judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Flanigan v. General Elec. Co.,* 242 F.3d 78, 83 (2d Cir.), *cert. denied,* 534 U.S. 1065, 122 S.Ct. 665, 151 L.Ed.2d 580 (2001). Once the moving party has come forward with sufficient evidence in support of the motion for summary judgment, the opposing party must

---

**5.** *See* note 1 *supra.*

"set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed. R. Civ. P 56(e); *Irby v. New York City Transit Auth.*, 262 F.3d 412, 414 (2d Cir.2001).

The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir.1998); *see also Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985). "Furthermore, the non-movant 'will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant.'" *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir.1996) (citations omitted). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Human Rights Law Claims

█ GE contends that Murphy's claims under N.Y. Exec. Law § 296 are time-barred because they were filed over three years after the alleged discriminatory action. Def. Mem. of Law at 16–17. Claims raised under the New York Human Rights law are subject to a three year statute of limitations measured from the filing of the action in court. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998). Here, Murphy filed his claim on February 11, 2000. Accordingly, any claim of discrimination alleged to have occurred prior to February 11, 1997 is time barred.

█ Murphy had departed GE and commenced new employment prior to February 11, 1997. Only the "protected service" extended Murphy's relationship with GE beyond February 11, 1997. However, receipt of a benefit such as protected service will not serve to extend the statute of limitations. *See Welty v. S.F. & G., Inc.*, 605 F.Supp. 1548, 1559 (D.Ala.1985); *Lippert v. General Elec. Co.*, No. C 81–0393–L(B), 1982 WL 197, at *3 (W.D.Ky. Jan.13, 1982). Moreover, the statute commenced to run here when Murphy received notice of his termination, a date well prior to February 11, 1997, and not the date on which his employment relationship with GE ended completely. *See Cordone v. Wilens & Baker, P.C.*, 286 A.D.2d 597, 598, 730 N.Y.S.2d 89 (1st Dep't 2001).

Murphy's third cause of action under New York law is time-barred. GE's motion on this ground is granted.

### C. ADEA Claims

Murphy's ADEA claim in the first cause of action is asserted on theories of disparate treatment, failure to rehire and disparate impact.

#### 1. Timeliness

█ As a threshold matter, GE contends that Murphy's ADEA claims prior to June 29, 1995 are time-barred. A plaintiff must file a complaint with the EEOC within 300 days of the alleged violation to preserve the ADEA claim for a lawsuit. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997). "[T]he limitation period begins to run on the date when the employee receives a definite notice of the termination [or adverse employment action]." *Economu v. Borg–Warner Corp.*, 829 F.2d 311, 315 (2d Cir.1987) (internal quotation marks omitted) (citations omitted).

In May 1994, Smith told Murphy that he should seriously consider a transfer to Outsourcing. Murphy had definitive notice of his transfer in June 1994 when he was transferred to Outsourcing. On Au-

gust 2, 1994, Murphy knew that he had been given a performance/promotability code of 3–B. Murphy Aff. I at Ex. C. On March 20, 1995, Murphy received his first notice of termination when Jenis verbally informed him that he would be terminated effective April 28, 1995. By June 29, 1995, Murphy knew that he had been rejected from fourteen of the thirty-eight jobs for which he had then applied at GE. Def. Exs. 29–30. Murphy was notified in writing on June 30, 1995 that effective August 31, 1995, his employment with GE was terminated. On August 18, 1995, Murphy's employment with GE was extended to May 3, 1996, his new and final termination date. Murphy filed an EEOC complaint on April 25, 1996. Def. Ex. 3. Three hundred days before Murphy's EEOC filing was June 29, 1995. Any claim based on alleged violations which occurred prior to June 29, 1995 are untimely and were not preserved for Murphy's lawsuit under the ADEA unless an exception exists.

■ Murphy argues, however, that the statute of limitations was extended to include the events prior to June 29, 1996 under the continuing violations doctrine. Pl. Mem. of Law at 20–26. GE contends that the continuing violations doctrine does not apply to completed acts such as discharges, job transfers or the discontinuance of particular job assignments as occurred here. Def. Reply at 10–11.

■ Under the continuing violations doctrine, all claimed acts of discrimination will be timely if committed pursuant to a discriminatory policy identified in the original EEOC complaint. *Marinelli v. Chao*, 222 F.Supp.2d 402, 412 (S.D.N.Y. 2002). "Discrete acts such as termination, failure to promote, denial of transfer or refusal to hire" do not generally form the basis for a continuing violation. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106

(2002). To establish a continuing violation, a plaintiff must show "i) an underlying discriminatory policy or practice, and ii) an action taken pursuant to that policy during the statutory period preceding the filing of the complaint." *Connecticut Light & Power Co. v. Sec'y of the U.S. Dep't of Labor*, 85 F.3d 89, 96 (2d Cir.1996). It is not a continuing violation if there are multiple incidents of discrimination that are not the result of a discriminatory policy. *Marinelli*, 222 F.Supp.2d at 412. The courts in this circuit only apply the continuing violations doctrine under compelling circumstances. *Findlay v. Reynolds Metals Co., Inc.*, 82 F.Supp.2d 27, 37 (N.D.N.Y.2000) (McAvoy, C.J.).

On June 7, 1994, Murphy was transferred to Outsourcing, which was expected to be disbanded within eighteen months. On August 2, 1994, Murphy knew that he had a performance/promotability code of 3–B. On March 20, 1995, Murphy was verbally notified of his termination. On June 30, 1995, Murphy received written notification of his termination. After numerous extensions, Murphy's last date of work was finally extended to May 3, 1996. However, the fact that GE continued to extend Murphy's termination date is insufficient to establish a continuing violation. *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination").

Nevertheless, viewing the evidence in the light most favorable to Murphy, GE pursued a policy of slowly eliminating older employees by transferring them to a temporary division, giving them a performance/promotability code making them ineligible for promotions or rehiring, eliminating their job titles and finally terminating the employee. Such an ongoing policy of terminating older employees led

to Murphy's termination. Thus, Murphy has established a continuing violation. Because Murphy met the filing deadline for the termination notice on June 30, 1995, Murphy's allegations of acts occurring prior to June 29, 1995 are not time barred. GE's motion for summary judgment on this ground is denied.

 In the alternative, Murphy contends that the hostile work environment to which he was subjected creates a continuing violation. Murphy failed to raise a hostile work environment claim in his amended complaint but raises it for the first time in his memorandum of law. Pl. Mem. of Law at 20. A hostile work environment claim constitutes a continuing violation if at least one act occurred within the 300 day filing period. *Morgan*, 122 S.Ct. at 2074. To establish a hostile work environment, "[t]he plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of . . . employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002).

 Murphy alleges that he was subjected to a hostile work environment because GE's CEO, managers and other GE employees expressed the desire for a younger workforce and to reduce the number of older workers. These allegations are insufficient to establish a hostile work environment to toll the filing requirement. Viewing the evidence in the light most favorable to Murphy, a reasonable person could not conclude that these comments adversely affected Murphy's work environment. Nor would a reasonable person find the work environment hostile because GE did not rehire Murphy for other available positions. Furthermore, " '[m]ere incantation of claims of hostile work environment will not be enough to invoke the continuing violation doctrine.' " *Bembry v. Darrow*,

97 F.Supp.2d 281, 286 (N.D.N.Y.2000) (Munson, S.J.) (quoting *Brown v. Middaugh*, 41 F.Supp.2d 172, 182 (N.D.N.Y. 1999)). Thus, Murphy's alternative argument must be rejected.

GE's motion for summary judgment on the ground that Murphy's ADEA claims are time-barred is denied.

### 2. Disparate Treatment Claim

 Disparate treatment requires evidence that an employer intentionally discriminated against an older employee. *District Council 37, AFSCME v. New York City Dep't of Parks & Recreation*, 113 F.3d 347, 351 (2d Cir.1997). To establish a disparate treatment claim, a plaintiff must first set forth a prima facie case of discrimination based on age. *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.), *cert denied*, 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001). If a prima facie case is presented, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant articulates such reason, the burden shifts back to the plaintiff to show that the proffered reason is a pretext for age discrimination. *Id.* GE contends that Murphy has failed to satisfy his burden at the first and third stages.

### a. Prima Facie Case

 To establish a prima facie case of disparate treatment, a plaintiff must demonstrate "(1) that [he] was a member of a protected class, (2) that [he] was qualified for the position, (3) that [he] experienced an adverse employment action, (4) under circumstances giving rise to an inference of discrimination." *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 316 (2d Cir.2001). Murphy's burden at this stage to defeat a summary judgment motion is de minimis. *Id.* Moreover, "in-

vidious comments about others in the employee's protected group" may provide an inference of discriminatory intent. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). "A plaintiff may also present statistical findings as circumstantial evidence of intentional discrimination." *Smith*, 196 F.3d at 370.

GE does not challenge the first three prongs but contends that Murphy failed to establish that he was transferred or terminated under circumstances giving rise to an inference of discrimination. Def. Mem. of Law at 21. Murphy contends that statistical evidence, GE's corporate culture of age discrimination and GE's use of subjective criteria in its selections of employees for termination all support an inference of discrimination.[6] Pl. Mem. of Law at 44–52.

Viewing the evidence in the light most favorable to Murphy, there is sufficient evidence to present a question of material fact whether Murphy's transfer and termination occurred under circumstances giving rise to an inference of age discrimination. The statistical analysis of GE's RIF in 1995 supports a hypothesis that age increased the likelihood of selection for the RIF. Zellner Report I. Murphy's manager, Smith, stated that she did not like working with older male employees and planned to terminate them. Murphy Aff. II at ¶ 16. Smith also stated that she was planning to replace Murphy with a younger person to run the Parts Center. Murphy Aff. II at

¶ 13. Other GE employees stated that GE did everything possible to eliminate older employees and that there were no jobs for people over age fifty-five at GE. Murphy Aff. I at ¶¶ 14–16; Murphy Aff. II at ¶¶ 14–15.

Shortly thereafter, Murphy was transferred to Outsourcing with the representation that he would remain there for five years. However, GE knew that Outsourcing would be disbanded within eighteen months. Jenis Aff. at ¶ 32. Less than one year later, Murphy was given a termination notice. Smith testified that the termination selection process was based on the use of subjective performance/promotability codes. Smith Dep. at 44–56. The use of these codes to select employees for termination without uniform application by GE managers and with the proportion of older workers coded 3–B supports an inference of discrimination and must be closely scrutinized. *See also* Section III(C)(2)(c) *infra.* Furthermore, a question of fact exists whether Murphy's former position was eliminated, *see* Plummer Aff. (Docket No. 44) at ¶ 11, and whether Murphy was intentionally transferred to a position which was slated for elimination. Murphy has thus presented sufficient evidence to establish a prima facie case of disparate treatment.[7]

### b. Legitimate Non–Discriminatory Reason

GE states that Murphy was transferred as part of a reorganization and that Mur-

---

**6.** Murphy also argues that GE followed a pattern and practice of discrimination by using a ranking matrix to select older employees for the RIF. Pl. Mem. of Law at 46–47. However, Murphy conceded that a ranking matrix was not used to select him for termination. Pl. Mem. of Law at 38. Therefore, Murphy cannot establish a pattern and practice of discrimination in this regard.

**7.** GE argues that Murphy cannot set forth a prima facie case of discrimination because, as Jenis both hired and fired him, Murphy cannot impute an invidious motive to Jenis. *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997). However, there is evidence that Murphy was forced to transfer to Jenis' group in anticipation of that position being eliminated and Murphy being terminated. Thus, an invidious motivation may be inferred from this evidence.

phy was terminated due to business-wide restructuring announced in March 1995. Def. Mem. of Law at 24–26. Murphy contends that GE failed to provide a sufficient explanation as to the disparate treatment of older workers and, thus, failed to set forth a non-discriminatory reason. Pl. Mem. of Law at 52–53.

Once a plaintiff establishes a prima facie case of disparate treatment, the burden shifts to the defendant to rebut the presumption of discrimination by offering a legitimate, non-discriminatory reason for the adverse employment action. *Abdu–Brisson,* 239 F.3d at 466. A defendant meets this burden if he presents reasons that, " 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.' " *Id.* at 469 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis omitted)). However, the defendant must state his reasons with specificity and present evidence based on objective and competent evidence. *Sweeney v. Research Found. of SUNY,* 711 F.2d 1179, 1185 (2d Cir.1983).

That evidence establishes that in the spring of 1994, the Parts Center was being restructured and Smith consolidated Murphy's and Plummer's managerial positions. After speaking with Smith, Jenis agreed to hire Murphy for his Outsourcing Team. Jenis Aff. at ¶¶ 22, 30. On March 10, 1995, GE issued an announcement that they were restructuring their workforce which would result in the loss of 950 salaried and 1,000 hourly workers with 550 salaried and 430 hourly reductions in Schenectady. Def. Ex. 23. In 1995 and 1996, GE had numerous terminations, voluntary resigna-tions and retirements as part of their RIF. Def. Ex. 15. On May 20, 1995, Jenis verbally notified Murphy of his termination and on June 30, 1995, Murphy was formally notified in writing by Dell Orfano that he was being terminated due to the RIF.

This suffices to establish age-neutral reasons for Murphy's transfer and termination and satisfies GE's burden at this stage.

#### c. Pretext

To establish pretext at the final stage, a plaintiff must show "that material issues of fact exist as to whether defendant's reasons for discharging plaintiff were pretextual." *Wolf v. Ferro Corp.,* 772 F.Supp. 139, 144 (W.D.N.Y.1991) (citing *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1115 (2d Cir.1988)).[8] "Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Chambers,* 43 F.3d at 38 (internal quotation marks omitted) (citations omitted). A plaintiff must satisfy this burden by a preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A plaintiff only needs to present evidence sufficient for a trier of fact reasonably to find that the employer's articulated reasons were pretextual. *Promisel v. First Am. Artificial Flowers, Inc.,* 943 F.2d 251, 259 (2d Cir.1991).

Murphy presented evidence that a bias against older employees motivated GE to transfer and then dismiss him. Dell Orfano stated that GE planned to replace

---

**8.** Murphy argues that whether GE's articulated reasons are pretextual is ultimately a question for the jury. However, summary judgment may be granted when a plaintiff has failed to provide adequate support for his contention that the termination was based on a discriminatory motive. *See Visco v. Community Health Plan,* 957 F.Supp. 381, 389 (N.D.N.Y.1997) (McAvoy, C.J.).

older workers with younger workers by transferring the older workers and then eliminating their new positions. Murphy Aff. I at ¶ 14. Rick told Murphy that after age fifty-five, a GE employee has hit a glass ceiling and has no job opportunity. Murphy Aff. I at ¶ 15. Smith told Foster that she wanted to terminate older employees. Murphy Aff. I at ¶ 16. Murphy's Parts Center position was consolidated with another managerial position. Smith offered Murphy only a transfer to Outsourcing. Murphy was not offered the opportunity to compete for the consolidated position. Def. Ex. 16. *See Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir.1989) (finding the fact that the employee was not offered either position given to younger employees was evidence of pretext). Additionally, Plummer's former duties were assumed by Omerad even though his former position had been consolidated with Murphy's.

Murphy was told that his transfer to Outsourcing was for five years and that he would then be transferred to Sourcing as Team Leader. Thus, he would be employed with GE until at least age sixty-two. In March 1995, the Team Leader position was assigned to Kathleen Smith, age thirty-seven, instead of Murphy, then age fifty-seven. Murphy Aff. I at ¶ 31; Murphy Aff. II at ¶ 16. On April 13, 1995, Jenis told Murphy that he would be offered a position as region leader in the Parts Center. Murphy Aff. I at ¶ 24. On April 18, 1995, Murphy learned that the Parts Center region leader position went to Janet Reville, then in her early thirties. Murphy Aff. I at ¶ 25. In 1996 when Outsourcing's work was completed, the Machine Parts work and the Wood and Plastics work was transferred to Sourcing whereas the Production and the Facilities work was eliminated. Murphy Aff. II at ¶ 20. Murphy worked in Wood and Plastics after Outsourcing disbanded and, thus,

a question of fact exists whether a position was still available for Murphy.

There is evidence that the performance/promotability codes were subjective and did not rely on objective criteria or standards. Murphy Aff. II at ¶ 5; Smith Dep. at 44–55. Smith testified that assigning a code rating was "obvious" to individual managers and she was not aware of any established criteria for evaluating employees. Smith Dep. at 44. Prior to July 1994, Murphy received annual performance appraisals of either exceeds or fully meets requirements with generally upward performance trends. Murphy Aff. II at ¶ 6; Pl. Exs. P–T. On February 3, 1994, Murphy was given a performance/promotability code of 2. Murphy Aff. II at ¶ 6, Pl.Ex. B. In August 1994, Murphy learned that he had been given a performance/promotability code of 3–B, which meant he was not promotable. Murphy Aff. II at ¶ 6, Ex. C.

Of the twelve employees transferred to Outsourcing in 1994, eleven were over age forty. Pl.Ex. at G–1. Of these eleven employees, eight were given a performance/promotability code of 3–B. Pl.Ex. at G–1. Of the eleven employees over age forty on the Outsourcing Team (92%), nine were terminated from GE in 1995. Pl. Exs. F, G–1. When he was terminated, Murphy was age fifty-nine. In 1994, 61% of GE's workforce was age forty and older, but 88% of those employees terminated were above age forty. Pl.Ex. F. In 1995, 63% of GE's workforce was over age forty and constituted 73% of the employees terminated. Pl.Ex. F. In 1996, 61% were over age forty but constituted 72% of those terminated. Pl.Ex. F.

Furthermore, viewing the evidence in the light most favorable to Murphy, he was given a performance/promotability code of 3–B because GE wished to ensure

that Murphy was not rehired after his transfer and termination notice. There is evidence that Murphy was not rehired by GE because of his age and his performance/promotability code of 3–B. After Murphy received his March 20, 1995 termination notice, he applied for fifty-seven jobs with GE. Murphy Aff. I at ¶ 30; Pl. Exs. I, J, K. Murphy applied for internal job postings and job postings in the newspaper. Pl.Ex. J. Murphy applied for a Global Energy Sourcing Leader position with a GE division in Pittsfield, Massachusetts. Pl.Ex. K. Murphy had three interviews for this position. Murphy Aff. II at ¶¶ 32, 33. In August, Murphy was told that he would not be hired because he was a code 3–B. Murphy Aff. II at ¶ 34. On an interview for another job with GE, Murphy was told that he was too old and that GE was not putting older people in that position. Murphy Aff. II at ¶ 35. Murphy was also not selected for a Sourcing Leader position with GE because he was coded 3–B. Murphy Aff. II at ¶ 36. Nine jobs that Murphy applied for were all given to younger individuals. Def. Ex. 33. Additionally, Murphy met or exceeded the qualifications for many of the available positions yet was not selected and many of those positions went to younger, less qualified individuals.

In sum, Murphy was transferred to Outsourcing, given a performance/promotability code of 3–B and less than one year later, Murphy was terminated. Viewing the evidence in the light most favorable to Murphy, a reasonable trier of fact could conclude that under the guise of a legitimate RIF for economic reasons, GE terminated its older workers, including Murphy, by transferring older employees, terminating them and preventing them from obtaining other employment with GE.

GE's motion for summary judgment on Murphy's disparate treatment claim in the first cause of action is denied.

### 3. Failure to Rehire

██ To establish a prima facie case of failure to rehire, a plaintiff must show that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Brown v. Coach Stores,* 163 F.3d 706, 709 (2d Cir.1998) (internal quotation marks omitted) (citations omitted) (failure to promote case). GE only challenges Murphy's proof under the second and fourth prongs. Def. Mem. of Law at 37–40.

██ GE contends that Murphy was not rehired because (1) thirty-five of Murphy's self-nomination forms were submitted between March 23 and June 25, 1995 when Murphy knew that he would not be hired for those positions; (2) Murphy was not qualified for most of the twenty-two jobs he applied for between June 29, 1995 and May 3, 1996; (3) many of the jobs were canceled; (4) Murphy submitted thirteen job applications late; and (5) Murphy was rejected because he was not qualified or because other applicants were more qualified.

Murphy applied for fifty-seven jobs with GE. The evidence establishes that four of these positions were canceled and Murphy was rejected for twenty-one positions. Def. Exs. 29–30. There is no information for the other thirty-two applications except that Murphy was not hired for any of those positions. Many of the qualifications listed for each position require a subjective evaluation of Murphy's experience. For example, one job posting required a proven ability to work effectively with minimum supervision. Another required proven leadership skills and excellent interpersonal and communication

skills. Def. Ex. 31 at 1260, 1037. Whether Murphy possesses these qualifications presents a question of material fact. However, Murphy has offered no evidence to show that any of the positions remained open and that GE continued to seek applicants with Murphy's qualifications. Additionally, even though Murphy has the names of fourteen employees selected for positions for which he was rejected (Def.Ex. 33), Murphy has failed to offer evidence of the qualifications of any of those individuals. Def. Ex. 33. Thus, Murphy failed to establish the fourth prong necessary to demonstrate a prima facie case of failure to rehire in violation of the ADEA.

GE's motion for summary judgment on this ground is granted.

### 4. Disparate Impact

■■ "Disparate impact ... results from the use of employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on a protected group and cannot be justified by business necessity." *Maresco*, 964 F.2d at 115 (internal quotation and alteration omitted) (citations omitted); *see also District Council 37, AFSCME*, 113 F.3d at 351. Disparate impact age discrimination does not require proof of discriminatory intent. *Smith*, 196 F.3d at 364 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Rather, the disparate impact theory addresses "[employment] practices that are fair in form but discriminatory in operation." *Griggs*, 401 U.S. at 431, 91 S.Ct. 849. Although courts of appeals are divided over the viability of the disparate impact theory under the ADEA, this theory of proof remains available in the Second Circuit. *See Smith*, 196 F.3d at 367 & n. 6.

■■ To recover for disparate impact, a plaintiff must first establish a prima facie case "by identifying a specific employment practice which, although facially neutral, has had an adverse impact on [him or] her as a member of a protected class." *Smith*, 196 F.3d at 364–65 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). The burden then shifts to the employer to offer a business necessity for the challenged employment practice. *Smith*, 196 F.3d at 365. If an employer offers such a business necessity, the burden then returns to the plaintiff to "show that the employer's proffered explanation was merely a pretext for discrimination." *Id.*

#### a. Prima Facie Case

■■ GE contends that Murphy's evidence failed to establish a prima facie case as a matter of law because Murphy failed to identify a facially neutral employment practice and the statistical evidence is insufficient to present a question of material fact. Def. Mem. of Law at 33–35; Pl. Mem. of Law at 35, 38–40, 61–64.

#### i. Facially Neutral Employment Practice

■■ Plaintiffs' initial burden under the disparate impact theory requires, *inter alia*, that he identify "a specific employment practice which, although facially neutral, has had an adverse impact on" older employees. *Smith*, 196 F.3d at 364; *Gonzalez*, 135 F.Supp.2d at 399. Murphy identified the use of subjective performance/promotability codes for the RIF selection process. Pl. Mem. of Law at 38. GE contends that this employment practice was insufficiently specific to satisfy Murphy's burden. Def. Mem. of Law at 33.

■■ The requirement that a plaintiff specify the employment practice which he or she alleges caused the discrimination

serves to insure that an employer not be held liable for discrimination simply because a result appears discriminatory numerically. *See Smith,* 196 F.3d at 367–68; *see also Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656–58, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Thus, "a plaintiff generally cannot rely on the overall decision-making process of the employer as a specific employment practice." *Smith,* 196 F.3d at 367; *Meacham v. Knolls Atomic Power Lab.,* 185 F.Supp.2d 193, 207 (N.D.N.Y.2002), *appeal docketed,* No. 02–7378 & –7474 (2d Cir. June 10, 2002).

Viewing the evidence in the light most favorable to Murphy, Murphy's challenge to the use of the performance/promotability codes suffices to establish a facially neutral employment practice. GE assigned a code of 3–B to older employees to facilitate their selection for termination and that they would not be rehired. At oral argument, Murphy also argued that the transfer of older employees to a division already marked for elimination was a facially neutral employment practice. A reasonable juror could conclude here that GE transferred Murphy and other older employees to Outsourcing to facilitate termination. This suffices to identify a facially neutral employment practice.[9]

GE's motion for summary judgment on this ground is denied.

### ii. Causation

■■■■ GE contends that Murphy failed to satisfy his initial burden of demonstrating that any disparate impact on Murphy was caused by age discrimination. Def. Mem. of Law at 34–35. Murphy responds that the statistical evidence offered through his expert witness sufficed to

meet this burden. Pl. Mem. of Law at 39–40.

■■■■ After a plaintiff specifies the employment practice at issue, a plaintiff must then demonstrate, generally through statistical data, that the employment practice caused a significant disparity in outcome between older employees and younger employees. *See Smith,* 196 F.3d at 365 (citing *Watson,* 487 U.S. at 994, 108 S.Ct. 2777). Where a plaintiff relies on a statistical disparity to meet this burden, that disparity "must be sufficiently substantial to raise an inference of causation." *Id.; see also Watson,* 487 U.S. at 994, 108 S.Ct. 2777 (holding that statistical evidence at this stage must be "of a kind and degree sufficient to" infer discrimination); *Gonzalez,* 135 F.Supp.2d at 399.

■■■■ No bright line rules have been established to determine the sufficiency of statistical evidence at this stage. *See Ottaviani v. State Univ. of N.Y. at New Paltz,* 875 F.2d 365, 373 (2d Cir.1989) ("in accordance with Supreme Court pronouncements, we must reject appellants' suggestion that this court announce a rule of law with respect to what level of statistical significance automatically gives rise to a rebuttable presumption of discrimination"); *see also Smith,* 196 F.3d at 365 ("no bright line rules exist"). However, courts generally require a plaintiff to meet two requirements. First, a "plaintiff must identify the correct population for analysis." *Smith,* 196 F.3d at 368. Generally, this population will be those employees who were subject to the employment practice in question. *See id.; Lander v. Montgomery County Bd. of Commissioners,* 159

---

**9.** Murphy also contended at oral argument that GE's use of matrices to select employees for the RIF was a facially neutral employment practice. However, Murphy conceded in his papers that a matrix was not used to select Murphy. Thus, Murphy cannot demonstrate that such an employment practice caused any disparate impact. This contention must be rejected.

F.Supp.2d 1044, 1060 (S.D.Ohio 2001); *Shah v. N.Y. State Dep't of Civil Serv.*, No. 94–CV–9193, 2001 WL 839986, at *7, n. 7 (S.D.N.Y. July 25, 2001).

Second, the results must be statistically significant. *Ottaviani*, 875 F.2d at 371; *Smith*, 196 F.3d at 366. "Statistical significance" measures "the probability that a disparity is simply due to chance rather than any other identifiable factor." *Ottaviani*, 875 F.2d at 371. One measure of statistical significance is standard deviation. *See Smith*, 196 F.3d at 365–66; *Ottaviani*, 875 F.2d at 371. Standard deviation is a "unit of measurement used to express the probability that an [actual] result is merely a random deviation from a predicted result." *Ottaviani*, 875 F.2d at 371. Generally, " '[t]he greater the number of standard deviations, the less likely it is that chance is the cause of any difference between the [predicted] and [actual] results.' " *Id.* (quoting *Coates v. Johnson & Johnson*, 756 F.2d 524, 536 (7th Cir.1985)). If the actual result varies from the predicted result by two standard deviations,[10] "[courts] generally consider this level of significance sufficient to warrant an inference of discrimination." *Smith*, 196 F.3d at 366; *see also Ottaviani*, 875 F.2d at 371–72.

As discussed above, the employment practices which Murphy challenges here were the use of the performance/promotability codes and the transfer of the employees to temporary assignments. *See* subsection (i) *supra.* Zellner's 1995 analyses

did not test the effect of the performance/promotability codes on the termination rate. Thus, Murphy has failed to present statistical evidence showing that the performance/promotability codes had an adverse impact on older employees. Murphy further failed to present a statistical analysis of the effect of transferring older employees to temporary assignments such as Outsourcing. Murphy has offered his own statistical analysis of the twelve employees in Outsourcing, but his analysis fails to establish a statistically significant deviation. *See* Pl.Ex. G–1. Thus, Murphy has failed to demonstrate causation.[11]

GE's motion for summary judgment on Murphy's disparate impact claim in the first cause of action is granted.

## IV. Conclusion

WHEREFORE, for the reasons set forth above, it is hereby

**ORDERED** that:

1. GE's motion to preclude (Docket No. 53) is **GRANTED** in part and **DENIED** in part as set forth above in section II;

2. GE's motion to preclude Murphy's expert report (Docket No.36) is **GRANTED** as to Dr. Zellner's report for the year 1996 and **DENIED** as to Dr. Zellner's report for the year 1995; and

3. GE's motion for summary judgment (Docket No. 41) is GRANTED as to all causes of action except the first cause of action asserting a claim under the ADEA

---

10. Two standard deviations equates approximately "to a 1 in 20 chance that the outcome is a random fluctuation. Three standard deviations corresponds to approximately a 1 in 384 chance of randomness. Finally, a range of four to five standard deviations corresponds to a probability range of 1 chance in 15, 786 to 1 chance in 1,742,160." *Ottaviani*, 875 F.2d at 372 n. 7 (citing M. Abramowitz & I. Steigan, *Handbook of Mathematical Functions*, National Bureau of Standards, U.S.

Government Printing Office, Applied Mathematics Series No. 55 (1966) (Tables 26.1, 26.2)).

11. Given this conclusion, it is unnecessary to consider GE's alternative argument that Murphy has failed to satisfy his burden of demonstrating discrimination at the third and final stage.

for disparate treatment, as to which the motion is **DENIED**; and

**IT IS FURTHER ORDERED** that the Clerk of Court serve a copy of this order, by regular mail, upon all parties to this action.

**IT IS SO ORDERED.**